## POWERS v. BULLWINKLE.

1. Where real property is conveyed to one in trust for "R and her children," and this property is afterwards sold under order of the Court of Equity in a suit between the trustee and R and her children, all proper parties were before the court and the title duly passed.

2. A conveyance to A as trustee for R and her children, does not prove that the property so purchased was paid for with money held by A as trustee, under a will, for R and her children, and so impress this property with the trusts and limitations specified in such will.

3. In the will of a testator who died prior to the act of 1853 (which declared the force of the words "without heirs of the body or issue") the following provisions were made: "All the parts of my estate, real and personal, herein intended for the support and maintenance of my daughter, E. R., during her natural life, shall, at her decease, revert and be divided equally amongst her children when they attain the age of twenty-one years and to the heirs of their bodies forever. And if any or either of her children should die before attaining the age aforesaid, or, having attained the age aforesaid, should die without issue of his or her or their bodies begotten, then the part or parts of such child or children so dying shall revert and be equally divided amongst the survivor or survivors of them; and, if all the children of my said daughter, E. R., should die before attaining the age aforesaid, or, having attained that age, should die without heirs of their bodies begotten, then all the parts of her children so dying shall return to be equally divided between the children of my sons W. and C., so that the parent shall not be heirs to their deceased children." *Held*, that each child of E. R. took a fee-conditional in his or her share, to be divested in the event of his or her death without issue previous to the period when all surviving children attained 21 years; with a general limitation over by way of executory devise to the children of W. and C., upon the death of all the children of E. R. without issue previous to the period when all surviving children should have attained the age of 21; and such limitation, tested by events possible at the time of its creation, was not an infringement of the rule against perpetuities.

4. And a lot of land acquired under the terms of this provision, having

been sold under order of the court with only the trustee and E. R. and her children parties to the suit, any defect arising from the absence of the children of W. and C. has been cured by the attainment of the age of 21 by all the children of E. R., and the birth of issue to them—for the event upon which the executory devise to the children of W. and C. was to take effect can never happen.

5. In a suit for the sale of land, one who has therein a mere possibility of reverter, is not entitled to representation.

6. A sale of a fee-conditional under order of the court, with the trustee and all proper parties before it, has the same effect upon the title as an alienation by a tenant in fee-conditional.

7. An alienation by the tenant of a fee-conditional bars the rights of issue then or thereafter born, who without such alienation would have taken *per formam doni*; the birth of issue to the tenant in fee conditional performs the condition and confirms in the purchaser a good title in fee.

8. This case distinguished from *McCorkle* v. *Black*, 7 Rich. Eq., 407.

Before ALDRICH, J., Charleston, May, 1890.

This was an action by M. W. Powers against J. H. Bullwinkle. The opinion states the case.

*Messrs. J. D. Cappelmann* and *J. E. Burke*, for appellants.

*Messrs. Trenholm & Rhett*, contra.

September 29, 1890. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. On February 13th, 1890, the defendant entered into an agreement in writing with the plaintiff to purchase from him a lot of land in the city of Charleston, on the south side of Montague street, between Pitt and Smith streets, described in the complaint, for the sum of $4,500, one-half cash, and balance in one and two years, with bond and mortgage of the premises to secure the other half. After the agreement, the defendant refused to accept title and pay the purchase money. This action was brought for specific performance. The defendant answered as follows:

"The defendant above named, answering the complaint herein:

"I. Admits each and every allegation of said complaint, save so much as alleges that the plaintiff was, on the 13th day of Feb-

ruary, 1890, and still is, the owner in fee simple of the property described in the first paragraph of said complaint.

"II. Alleges for a defence thereto: 1. That William Royal, by his will, dated 15th September, 1831, and proved 2nd April, 1835, devised among other things as follows: 'All the parts of my estate, real and personal, herein intended for the support and maintenance of my daughter, Eliza Rivers, during her natural life shall, at her decease, revert and be' divided equally amongst her children when they attain the age of twenty-one years, and to the heirs of their bodies forever. And if any or either of her children should die before attaining the age aforesaid, or having attained the age aforesaid should die without issue of his, her, or their bodies begotten, then the part or parts of such child or children so dying shall revert and be equally divided among the survivor or survivors of them, and if all the children of my said daughter Eliza should die before attaining the age aforesaid, or having attained that age should die without heirs of their bodies begotten, then all the parts of her children so dying shall return and be equally divided between the children of my sons William and Croskeys, so that the parent shall not be heirs to their deceased children.'

"2. That there were several changes of trustees, and that before 1843 A. G. Magrath was the substituted trustee of Mrs. Rivers and children, holding upon the terms of the will above set forth, and that he was trustee for Mrs. Rivers and children upon no other trust or upon trusts created by no other person.

"3. That on the 27th day of September, 1843, James W. Gray, Robert Elfe, trustees, conveyed this property to A. G. Magrath, trustee, on the following terms: 'To have and to hold all and singular the aforesaid lot of land with all the appurtenances to the same belonging unto the said A. G. Magrath, trustee of Eliza Rivers and children, his heirs and assigns forever.'

"4. That on the 16th day of December, 1845, W. M. Rivers, the eldest son of Eliza Rivers, was duly appointed trustee in place of A. G. Magrath.

"5. That on the 2nd day of December, 1846, proceedings were commenced in the Court of Common Pleas for Charleston County by W. M. Rivers, said trustee, to sell the said property, to-

gether with other property, as unproductive and to reinvest the proceeds. That the only parties to this proceeding were the trustee, Mrs. Eliza Rivers and her children, to wit, W. M. Rivers, Maria T. Sibley, widow of Louis L. Sibley, both over 21 ; W. B. Rivers and Capers M. Rivers, infants. That the trustee sold under these proceedings and plaintiff deduces title therefrom.

"6. That in the said proceedings of December 2nd, 1846, W. M. Rivers, the substituted trustee, sets out in his petition as follows : 'That the said trust property now consists of a house and lot in Wentworth street, and a house and lot in Montague street, and certain other property.' 'That the parties interested in said trust property are Mrs. Eliza Rivers and her children, Maria T. Sibley, widow of Louis L. Sibley, your petitioner, of full age of 21 years, and W. B. Rivers and Capers M. Rivers, infants.'

"7. That the said Maria T. Sibley, one of the children of Mrs. Eliza Rivers, had living on December 2nd, 1846, one child, who was not made a party to the said proceedings. At that time W. B. Rivers and Capers M. Rivers had had no issue and did not have until years afterwards. All the children of Mrs. Rivers, however, who had no issue then, had issue afterwards. Three of her said children are now alive, and one of them, W. B. Rivers, is dead, leaving issue. On December 2nd, 1846, there was also alive children of William and Croskeys Royal, who were the children of the aforesaid William Royal, the testator before mentioned.

"This defendant therefore alleges that the proper parties were not made to the proceedings for sale in 1846, through which sale plaintiff claims title."

The plaintiff demurred to the answer, on the ground that it did not state facts sufficient to constitute a defence. The Circuit Judge sustained the demurrer and gave the plaintiff judgment thereon. The defendant appeals to this court upon the following grounds, to wit :

I. Because his honor should have overruled the demurrer for the reason that all necessary parties were not made to the proceedings of 1846, under which the trustee sold and under which the plaintiff claims title, inasmuch as by the true interpretation of the will of William Royal, the children of Mrs. Eliza Rivers had but a life estate, and their children had interests, and one at

least (a child of Mrs. Sibley) was alive at the time of said proceeding, and was not a party thereto.

II. Because his honor should have overruled the demurrer, for that the estate of the children of Mrs. Rivers was not a fee-conditional, because the generality of the words, "heirs of the body," used in connexion with the devise to them, is cut down by the subsequent expressions of the will, so as to make it a phrase of purchase and not of limitation, and so the proper parties were not before the court in the proceedings of 1846, as none of the grandchildren of Mrs. Rivers were parties thereto.

III. Because his honor should have overruled the demurrer, for that if the estate of the children of Mrs. Eliza Rivers was a fee-conditional, the alienation of the trustee under said proceedings was not the same as the alienation by the parties, and even if it operated as an alienation by the parties, at least two of the children of Mrs. Rivers had no children until after the decree of 1846, and hence, whether such alienation would be good or not, depends on whether those children survived their parents, and at least two of such parents are now alive, and the question is still uncertain.

IV. Because his honor should have overruled the demurrer, for that if a fee-conditional in the children of Mrs. Eliza Rivers, the persons entitled to take in case of the death of the tenants in fee-conditional, or any of them without issue, were not before the court in the said proceedings of 1846.

There is no one before the court pressing an adverse claim to the lot which was sold by order of the court more than forty years ago, but the defendant, having agreed to purchase it, refuses to carry out his agreement, upon the ground, as alleged, that the plaintiff is not able to make good titles; and whether he is or not, is the question of the case. It seems that the plaintiff holds under a sale made by order of the court of trust property for reinvestment, and the allegation is, that in that proceeding all necessary parties were not before the court, and therefore the title is not such as the court will require the defendant to accept, the rule in such case being that the purchaser will not be required to take title if it is incurably bad or of doubtful validity. If there is a defect in the title, and it is a curable one, and the

defect is remedied, he cannot refuse to complete the purchase. *Trapier* v. *Waldo*, 16 S. C., 280, and authorities.

First. We hear of no specific mention or identification of the lot in question until September, 1843, when James W. Gray and Robert Elfe, trustees, conveyed it "to A. G. Magrath, trustee, to have and to hold all and singular the aforesaid lot of land, with all the appurtenances, &c., unto the said A. G. Magrath, trustee of Mrs. Eliza Rivers and children, his heirs and assigns forever," &c. On December 16, 1845, W. M. Rivers, the eldest son of Eliza Rivers, was appointed trustee in place of Magrath, and on December 2nd, 1846, he instituted proceedings in the then Court of Equity to sell the lot (with other property) and to reinvest the proceeds of sale on the terms of William Royal's will. This was the proceeding under which the lot was sold. The parties were Mrs. Eliza Rivers and her children, viz., W. M. Rivers, trustee, Maria T. Sibley, widow of Louis L. Sibley, both over 21 years of age, and W. B. Rivers and Capers M. Rivers, infants. In the view that the deed to A. G. Magrath expressed the trusts impressed upon the lot, there could not be a question that all necessary parties, Mrs. Rivers, the trustee, and her children, were before the court when the land was sold. The lot was conveyed in fee to A. G. Magrath, trustee, for Eliza Rivers and her children. That trust was transferred to W. M. Rivers, and he and his mother and brothers and sisters were all parties.

Second. But from certain statements in the petition to sell the lot (1846), it is sought to draw the inference that the lot in question, although not specifically mentioned in his will, was, by reinvestment, or in some other way, a part of the estate of William Royal, deceased, and impressed with the trusts of his will; that the trust in the deed to Magrath, substituting him as trustee, was really nothing more than an unsuccessful effort to restate the trusts of Royal's will, which, being the original, must govern. As it strikes us, there is not satisfactory evidence that the lot, or the money which purchased it, ever was the property of the estate of William Royal.

But if that were conclusively shown, how would the matter stand under the trusts declared in his will? The will of William Royal (proved in 1835) contains the following provision, viz.:

"All the parts of my estate, real and personal, herein intended for the support and maintenance of my daughter, Eliza Rivers, during her natural life, shall at her decease revert and be divided equally amongst her children, when they attain the age of 21 years, and to the heirs of their bodies forever. And if any or either of her children should die before attaining the age aforesaid, or having attained the age aforesaid, should die without issue of his or her or their bodies begotten, then the part or parts of such child or children so dying shall revert and be equally divided amongst the survivor or survivors of them; and if all the children of my said daughter Eliza should die before attaining the age aforesaid, or, having attained that age, should die without heirs of their bodies begotten, then all the parts of her children so dying shall return to be equally divided between the children of my sons William and Croskeys, so that the parent shall not be heirs to their deceased children." The testator died before 1853, and the will must be construed without reference to section 1862 of the General Statutes, as to the effect to be given to the words "heirs of the body" or "issue."

It is stated in the answer, which, under the demurrer, must be taken as true, that when the proceeding to sell was filed (1846), Mrs. Sibley, one of the four children of Mrs. Rivers, had a living child who was not made a party. At that time W. B. Rivers and Capers M. Rivers had no issue, and did not have until long afterwards. All four of the children (before or after the sale) had issue, and one of them, W. B. Rivers, is dead, leaving issue. In this state of facts, the defendant suggests that the clause of the will above cited gave first a life estate to Mrs. Rivers, with remainder over to each of her children for life with remainder to their issue in fee; that the issue of Eliza take by purchase, and therefore the child of Mrs. Sibley, *in esse* at the time of the sale, should have been made a party as a contingent remainderman, to represent that class; in default of which none of the class are bound by the judgment of the court in 1846, but now have a claim against the property, under the authority of *Moseley* v. *Hankinson*, 22 S. C., 329.

What estate did the children of Eliza take under the will of their father, William Royal? It is conceded that, under the

direct gift, each of them upon their arriving at the age of 21 years took a fee-conditional in his or her share. The words are precisely those which create such an estate: "to be equally divided amongst her children, when they attain the age of 21 years, and to the heirs of their bodies forever." But it is said that the clause which follows may have the effect of cutting down the estates of the children to estates for life, with remainder over to their issue as purchasers, under the authority of *McCorkle* v. *Black*, 7 Rich. Eq., 419. We cannot take this view. That was certainly not the intention of the testator, and we know of no rule which requires such construction. The words are: "And if any or either of her children should die before attaining the age aforesaid, or, having attained the age aforesaid, should die without issue of his or their bodies begotten, then the part or parts of such child or children so dying shall revert and be equally divided amongst the survivor or survivors of them ; and if all the children of my said daughter Eliza should die before attaining the age aforesaid, or, having attained that age, should die without heirs of their bodies begotten, then all the parts of her children so dying shall return to be equally divided between the children of my sons William and Croskeys, so that the parent shall not be heirs to their deceased children," &c. There is no reference here to a life estate. The direct gift was "to them and the heirs of their bodies forever."

In the case of *McCorkle* v. *Black, supra*, the words were very different. In that case there was a devise of lands to two or more persons to be equally divided among them, "to them during their lives, and after their death to their lawful issue ; followed by a provision that if any of the said devisees should die, 'leaving no lawful issue, the portion or portions of him or her so dying shall be equally divided among the survivors,' &c. *Held*, that the first takers or devisees named in the direct bequest took a life estate with remainder to their issue as purchasers." Even in that case Chancellor Wardlaw concurred only in the result, saying: "The proposition of the appellants, that the devisees here take a fee-conditional, seems to me to be properly deduced from the terms of the will. This is conformable to the opinion of one half of the Court of Errors in *Buist* v. *Dawes*, and is sufficiently vindicated

in the opinion of Chancellor Dargan in that case (4 Rich. Eq., 430). I think, however, that there may be a valid executory devise upon a fee-conditional, if limited to take effect within lives in being and twenty-one years afterwards; and that in the present instance the limitation over does not infringe the rule against perpetuities," &c. See also the case of *Roe* v. *Scott*, quoted in *Stevens* v. *Patterson*, Bailey Eq., 45; *Graham* v. *Moore*, 13 S. C., 119; and *Mendenhall* v. *Mower*, 16 *Id.*, 308.

In the last case the instrument was a deed, and therefore there could be no executory devise; but in discussing the subject the Chief Justice clearly stated the point as follows: "It has been well established that where a fee in real property has been devised to one with a limitation over at his death, without issue at that time, the limitation will be good as an executory devise. In a deed the limitation over is good as a remainder, unless it should clearly appear that a fee had been given in the first instance to the first taker. In such case the limitation could not take effect in a deed as a remainder, because the whole estate having been granted, there would be nothing left to be embraced in the remainder. But in a will or devise, a fee may be limited, after a fee the essential requirement being that the period fixed for the limitation should not be beyond a life or lives in being and twenty-one years thereafter. If fixed within that time, the original fee will be defeated by the happening of the contingency specified, and the second fee will spring into existence at that moment by executory devise," &c.

We think that each of the children of Eliza, on attaining the age of twenty-one years, took a fee-conditional in his or her share, to be divested in the event of his or her dying without issue previous to the period when all surviving children attained twenty-one years; with a general limitation over by way of executory devise to the children of William and Croskeys, upon the death of all the children without issue previous to the period when all surviving children should have attained the age of twenty-one years; and that such limitation, tested by events possible at the time of its creation. was not an infringement of the well established rule against perpetuities. In this view the proper parties to the court proceedings for sale and reinvestment (1846) were

the trustee, the life tenant, Mrs. Rivers, her four children, repre-
senting respectively their descendants, born or to be born, and
the children of William and Croskeys, the ultimate contingent
remaindermen by way of executory devise.    Mrs. Rivers and her
four children (one of them trustee) were regularly made parties.
The children of William and Croskeys, however, were not made
parties; but as all the children of Eliza attained the age of twen-
ty-one years, and had and have issue living, the event upon which
the executory devise to them (children of William and Croskeys)
was to take effect never occurred, and therefore their absence as
parties in the court proceedings has long since been cured.

As we understand it, "the possibility of reverter" was not such
an interest or estate as entitled it to representation before the
court.    "Where a fee-conditional is granted, the whole estate is
in the tenant in fee; there is no estate left to the grantor.    The
possibility of reverter on the determination of the fee by the death
of the tenant without heirs of his body is not an estate; it is
neither the subject of inheritance nor of devise," &c.    *Adams v.
Chaplin*, 1 Hill Ch., 276; *Deas v. Horry*, 2 *Id.*, 244.

But it is finally urged that a sale for reinvestment of trust pro-
perty, by order of the Court of Equity, was not an alienation in
the sense of the principle which authorizes a tenant in fee-con-
ditional, after performance of the condition, to sell and convey
the whole interest.    We have not been referred to any authority
upon the precise point; but upon general principles, the powers
of the Court of Equity in reference to trust estates are very large
and far-reaching.    It acts upon the property itself, taking care
of the interests of the parties.    Sales made by order of the court
are presumed to be convenient and expedient, and sometimes ab-
solutely necessary.    See *Bofil v. Fisher*, 3 Rich. Eq., 1, and
cases of that class.    We cannot doubt that a sale ordered by the
Court of Equity, having jurisdiction of the subject matter, is
binding upon all parties before it, and those properly represent-
ed by them.

It is true that the sale was made many years ago (1846), while
some of the parties were minors, and before they had performed
the condition of having issue.    But they afterwards had issue
which are still living.    It is said that in a fee-conditional, "an

alienation, either before or after the birth of issue, is sufficient to bar the rights of those who are to take *per formam doni*, and to make the title of the purchaser good." *Barksdale* v. *Gamage*, 3 Rich. Eq., 274.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.